Good afternoon. We have two cases scheduled for this afternoon, although it looks like a lot of moving parts on them. So let's get started with our first case, which is 17-4014 Apollokoff v. St. Mark's Hospital, Mr. Singh. Thank you, Your Honor. May it please the Court, my name is Tejinder Singh. I represent the appellant. This is a false claims act case at the pleading stage. The central question for the Court is whether the complaint plausibly alleges that the defendants, Sherman Sorenson and the two hospital defendants, performed unnecessary cardiac surgeries, specifically the closure of a hole in the heart called the patent foramen ovale. When you say cardiac surgery, could you explain a little better? I thought it was just a, they don't open the chest for this, right? That's true, ordinarily not. The principle method by which this is done is a percutaneous closure. So a cut is made in the leg into a vein, a catheter is inserted up through the vein into the heart. Much like you'd do a stent? I'm sorry? Much like you'd do a stent? I think the process is similar. I'm not entirely familiar with stent procedures, so I don't want to oversell the comparison. But the way this works is that a closure, usually a medical device, a closure device, is inserted via the catheter and then the hole is found. Now, there are different ways this is sometimes done to get the right imaging to find where the hole is. Sometimes patients are placed under general anesthesia. This stuff is not in the complaint and so I don't want to talk about it too much, but just for the Court's information and edification, the procedure is sometimes done with local anesthetics, sometimes with the general, and sometimes can be more involved than others. The question is whether these procedures were medically necessary in the circumstances in which they were performed. The complaint alleges repeatedly and emphatically that they were not, and to show that those allegations are plausible, the complaint explains that there has been a debate in the medical community about whether you can perform these procedures for patients who have already had a stroke and who are a cryptogenic stroke, that is a stroke where you can't explain the causes, and where they are not responding to drug therapy. There has been no real debate in the medical community at all about whether you can perform it in the circumstances alleged here, that is, before a patient ever even has a first stroke. And that is because to do this is frankly far beyond the bounds of anything contemplated by the general medical community. And what's pled here is enough for the Court to see that you have some medical history of each of the patients in question? So Your Honor, our client... Or does it get that detailed? Our client did personally observe certain procedures being performed on patients who did not have the indications that would support this procedure, and the understanding based on conversations had with other doctors at the hospitals where these procedures were being performed, sometimes 16 times a week, 8 times a day, 2 days a week, was that many cardiologists raised many concerns that patients for whom this was not necessary were getting the surgeries. There's also the fact that Intermountain Hospital in 2011 suspended Dr. Sorenson, and then he surrendered his privileges precisely because he was performing surgeries that were not indicated by their guidelines. I was getting down to the specificity of it. I thought that was part of the problem that there was not enough connection or information for the defendants to know really what patients at what time with what diagnosis and what outcomes. Why is it not medically necessary? I do not think that that is what the District Court held, just as a start. I think the District Court held as a blanket matter that unless CMS issues either a regulation or a national coverage determination barring the use of a medical procedure for a particular indication, then a claim for reimbursement can never be false. That is the blanket holding of the District Court. And we think that that is plainly wrong for the reasons described in the brief. Most coverage decisions are not made by national coverage determination. They are made by case-by-case adjudication. And to say that you can never have a false claim in those circumstances is a sweeping standard that would gut federal health care fraud enforcement. As to your specific question... Some of these surgeries would be medically necessary, correct? I mean, this procedure, there are patients for whom this procedure is medically necessary. Yes, that is correct, Your Honor. And as we said, there is an ongoing debate in the medical community about this, but there are situations, for example, if you had multiple cryptogenic strokes and you are not a good candidate for drug therapy, things like blood thinners, then this surgery is generally regarded as a good idea. Well, in your complaint, did you lump in all surgeries or did you exclude from the complaint allegations ones that were medically necessary? So our complaint does not say, here are some that were medically necessary. The allegation in the complaint is that the identified surgeries were not medically necessary. Whether that is true or not is, of course, a matter of fact that can be proved at summary judgment or at trial. What we know is that a great many of the surgeries performed by Dr. Sorenson surely were not medically necessary. And winnowing down the identified surgeries, figuring out which ones were actually necessary or not, that's a matter of the proofs. Is there going to be a mini-trial then on each of these surgeries on whether it was or was not medically necessary? Courts are managing this issue in different ways because this issue does arise with some frequency. You have a hospital or a pharmaceutical manufacturer or other health care provider who provides services on a massive scale. And they are alleged not to be medically necessary, but there may be exceptions to that. And courts are dealing with this in different ways. What most courts conclude is that this ultimately comes down to a question of the damages. And they can do it either through statistical methods, through an audit where some experts will go through the various claim procedures and decide which ones are necessary, which ones are not necessary. In some cases, bellwether trials have kind of been held. But it really depends on the circumstances of the given case. It's not an issue that's been argued or briefed yet. And, of course, it's not an issue that deals with the sufficiency of the complaint. The allegations in the complaint – I don't think we've gotten to the point that I thought was the chief argument by the defendants here, which is that you say medically necessary. They say that's not an objective standard. Dr. Sorensen thought this was a good thing for his patients, and that was enough. And there's no way that can be a false claim when the physician thinks this is the right thing to do. So where do you get an objective standard for the term medically necessary? The clearest place it's been written down is in the CMS Medicare Program Integrity Manual. The relevant provisions are reproduced pretty much verbatim on pages three and four of our reply brief. And I can show you those. But basically what that manual says is that – and this is also consistent with adjudications by the Department of Health and Human Services when they make coverage decisions. What the manual says is that there are two ways to derive from definitive randomized clinical trials or other definitive studies. There are no such trials or studies supporting the surgeries here. And I don't take the defendants even to dispute that. The second possibility is general acceptance by the medical community as supported by sound medical evidence based on – and there are three possibilities – scientific data or research studies published in peer-reviewed medical journals, consensus of expert medical opinion, i.e., recognized authorities in the field, or medical opinion derived from consultations with medical associations or other health care experts. The manual specifically says – and here I'm quoting again – acceptance by individual health care providers or even a limited group of health care providers normally does not indicate general acceptance by the medical community. You're saying that implicitly at least the defendants certified that these procedures satisfied those requirements in the manual. Is that right? That is correct, yes. Now what did they each do to certify that? Dr. Sorenson filled out one form. The hospitals had a different form. Briefly describe with respect to Sorenson, but I'm more interested in with respect to the hospitals, how they certified it. So the hospital – Sorenson's form, the form 1500, has an explicit certification about this, and it's very clear. But I would say more broadly, and this applies to all of the defendants, medical necessity is a core requirement for reimbursability. You cannot get to reimbursement for unnecessary medical services outside of very, very, very narrow, very, very well-defined circumstances. Experimental. Certain experimental procedures. Exactly right. And these would not qualify as that under any logical argument. They're not arguing. And so there is – because it is so fundamental to the reimbursement decision, it is implicit in every claim for reimbursement that the services were medically necessary. That is – Okay, now how did the hospitals certify in this case? Because they weren't charging for his services. That's correct. The hospitals charge for their own services. So when these surgeries are performed, they're performed at the hospitals in their catheterization lab usually. And so lab technicians, anesthesiologists, other support staff, the services of those people, the materials that they provide, all of that gets charged to the government as well. And now under Medicare Part A and Part B, there's sort of different reimbursement procedures, but for Medicare Part A, which is hospital services, the way this works is there are interim reimbursement requests sought, and at the end of the year, there's a cost report, and the two numbers are compared. But the certifications are implicit in the interim reimbursement requests and the cost. So they certify that the surgery was necessary as opposed to the work of the nurses and the anesthesiologists and so on was necessary. So the defendants in this case haven't attempted to disaggregate those two things, because obviously I think, you know, if you have a surgical technician helping out on the surgery, for the surgical assistance to be necessary, the surgery has to be necessary. It's not – I don't think you can actually pull them apart. You say they're not disputing that. Well, they haven't, to my knowledge in their briefs, made anything of this. They haven't said, for example, that even if the surgeries were medically unnecessary, the ancillary hospital services were medically necessary. That argument is not going to happen. You also have a conspiracy claim. Is that correct? Is that a different issue? I think it is, because the hospitals also facilitated the surgeries. The allegations in the complaint say that both Intermountain and St. Mark's Hospital rolled out the red Sorensen. He kept their catheterization labs hopping, and they were well aware that he was performing a large, large number of surgeries there. They courted his business actively when he threatened to move it to other hospitals, and they were certainly involved. They had an agreement that he was going to perform these surgeries at their hospitals, and I think that that conspiracy places them on the hook also for the fees charged for the surgical services that Sorensen billed for. I know a lot is going to happen after I sit down, so I'd like to save some time for rebuttal if I can, but if there's a pressing question, I'd love to answer that, too. Thank you. May it please the Court, Sarah Carroll on behalf of the United States. The government has addressed both constitutional and statutory claims in this case, and of course I want to be very careful to answer any questions the Court might have about the constitutional issues, but if the Court doesn't have concerns on those, I'm inclined not to spend too much time on them because we think, first, they're forfeited, and second, the constitutional arguments very plainly lack merit. The district court statutory analysis, on the other hand, suffers fundamental flaws that the government is very concerned about. The district court, as Judge Hart, I think requirement that is not found in the text of the False Claims Act. The False Claims Act applies to false or fraudulent claims. This Court and the Supreme Court have said repeatedly that it applies to all fraudulent attempts to get the government to part with its money, and in Escobar, just a couple of years ago, the Supreme Court reiterated that to the extent that courts are concerned about notice or open-ended liability, they should be addressing those concerns by enforcing the materiality and scienter standards, not by constricting what it means for a claim to be false. Are you saying that there's not an objective standard here? We think that the False Claims Act extends beyond... No, no, I'm in this case. But, yes, no, we think there is an objective standard in this case, Your Honor, and certainly this Court could, we would hope the Court would not, you know, affirmatively embrace the standard that the district court applied, but this Court could just decide the question whether a claim for reimbursement from Medicare was for a reasonable and necessary service is an objective one that, you know, a judge or a jury can... And where do we get that objective standard? So I would look primarily to these adjudications in the Medicare reimbursement context. I think Mr. Singh summed up the considerations pretty well when he explained that... Well, he referred to the manual specifically. Do you not think that the manual is authoritative, or is that why you're relying on adjudications? So the manual does not have the force of law, so I do not want to say that someone would submit a false claim simply by not obeying the manual. People submit a false claim if they violate the statutory requirement that a claim for Medicare reimbursement be reasonable and necessary. But Medicare, CMS, in the course of applying that statutory standard in its adjudications has made very clear that whether something is reasonable and necessary depends on whether there is published authoritative evidence supporting its use or whether it's generally accepted in the medical community. Here the relator has at least stated a plausible claim that those standards were not satisfied, and the relator has also made a number of additional allegations that further support a plausible inference, which of course is all we need at the pleading stage that the defendant here submitted false claims knowingly. For example, the relator alleges that the doctor was falsifying charts to, you know, conceal that he was performing these surgeries for a reason other than what he was recording in the charts. The relator alleges that this doctor was sometimes poking holes in people's hearts so that he could perform the surgery. That doesn't help you with the claim against the hospitals, though, does it? I think that it goes most directly to the doctor's conduct and the doctor's center, yes, but we also have, you know, these allegations that other physicians were expressing concern that one of the hospitals at least eventually saw fit to take action against this doctor because he was performing procedures that in the hospital's view endangered patients. This doctor was performing these procedures allegedly at a much higher rate than anyone else. The complaint alleges, I think, that the Cleveland Clinic did 37 of these procedures in 2010, whereas this doctor alone did 800 some in that year. All of that together combines to create, in our view, more than a plausible inference. If it's such a good claim, why don't you intervene? There are a number of reasons why the government might decide not to intervene in a given case, and some of those reasons do not bear on the merits of the case. I don't know exactly why the government didn't intervene in this case, but we certainly think that the district court was wrong to dismiss the claim as a matter of law on the theory that it was, that it could not be false. In the little time I have remaining, I guess I would like to briefly address the defendant's argument that, okay, even if the district court was wrong to think of this as a matter of falsity, the district court could have said that as a matter of law there is no scienter, but that is not correct under the False Claims Act. The question is whether a particular defendant knew or should have known that the claim he was submitting was false, and that requires, you know, a fact-specific inquiry into what the defendant knew or should have known. And here the allegations in the complaint give plenty of basis to provide a plausible inference of scienter. Thank you, counsel. Thank you. Good afternoon, Your Honor. May it please the Court. My name is Scott Ballinger, here for the defendant, St. Mark's Hospital. Counsel for Dr. Sorensen has graciously agreed to let the hospital defendant split our time here today, but wanted me to let the Court know that, of course, he joins in our arguments to the extent they are pertinent. I think it's important to just start by reviewing the bidding here. I understood Relator's opening brief to be arguing that these medical articles attached to the complaint would show the Court that what Dr. Sorensen was doing was outside the bounds of accepted medical practice. I think the defendant's briefs in this case showed conclusively that that's just not true, that those articles simply do not say what Relator says they should. Where is there any evidence that this is accepted generally in the medical community? Well, Your Honor, it's their burden to plausibly allege that it's not. Are you saying that these articles suggest that this procedure could be performed in utero on unborn children, for example? It doesn't specifically say you can't, does it? These articles don't remotely address that question. Right, because they say that the only controversy here is whether, though, they say in cryptogenic cases after a stroke or two, after multiple strokes, I think it says, then it's possible. Your Honor, these guidelines that they're citing, it's almost like an anthropic problem. They are citing the AHA-ASI guidance for treatment of stroke patients, meaning people who have already had strokes, okay? AHA-ASA has promulgated separate guidance for the treatment of patients who have not yet had a stroke. That guidance is cited in the footnotes, but they don't talk about it. It is appropriate for judicial notice. It says that these PFOs are a well-understood risk factor for first stroke, and it expressly declines to make any recommendation about appropriate treatment, leaving appropriate treatment up to the clinical judgment of individual cardiologists. And I think it's really important to understand the sleight of hand that they're doing here with the Medicare Program Integrity Manual. When Mr. Singh was up here quoting from the manual, he was quoting from Section 13.7 of the manual, which is the CMS's guidance to its local contractors about the kinds of evidence they need to have before issuing a local coverage determination, like, to the world, here's what we're going to cover and here's what we're not. And that is a relatively high standard. But that is not the standard for evaluation of an individual claim. In fact, if you read 13.7, at the very end it says so explicitly. That standard is in 13.3 of the manual, which is the provision that governs individual claim submissions. It refers to Section 13.5 for the governing standard, and that standard is consistent with accepted medical practice. Now it is incredibly common for accepted medical practice to embrace debate, uncertainty, and a variety of different approaches to medical treatment. What do we do with the guidelines that were promulgated by these hospitals? Weren't there guidelines within the hospitals, your client, that said this is something that we don't approve? No, Your Honor. The allegation is that in August of 2011, very shortly before Dr. Sorensen retired, that Intermountain had an internal review process, they had a robust debate, and they decided to adopt some internal procedures about when these things should be performed and when they shouldn't. Can we look to these internal procedures to determine whether or not these procedures that were performed by the doctor were medically necessary? Well, Your Honor, I suppose it's one data point, but the adoption of an internal guideline by one hospital does not immediately make every other approach to practice across the Well, let me ask you a question in this way. Is there any evidence that it is medically acceptable to perform this procedure for treatment of migraines? Your Honor, there's nothing alleged in the complaint about that. They are resting their complaint on the allegation that what Dr. Sorensen did is outside the bounds of accepted medical practice, which is the standard. And their allegation is that that is shown by these AHA, ASA guidelines, which are addressed to the appropriate treatment of stroke patients. There's no references to migraines? They don't allege a single thing that would tell this Court that it is inconsistent with generally accepted medical practice to treat migraines with a PFO. There's nothing. It's not addressed in these articles at all. And the leap that they want to make is that if the AHA and ASA are saying we're not sure about appropriate treatment for patients who have had one or two strokes, then therefore it must, simply must as a matter of logic, be the case that the medical community rejects these procedures for anybody who hasn't had a stroke. And it's just simply not true, as shown by the AHA and ASA's own guidelines for pre-stroke patients, which are referenced in their own materials.  Yes. Do you need to put on your medical evidence to support the complaint before it can be dismissed? Your Honor, they have to allege, after Colombole, they have to allege facts giving rise to a reasonable inference of liability. In this context, that means they have to plead facts giving rise to a reasonable inference that what Dr. Sorensen did was outside the range of accepted medical practice. And they simply have not done it. And the district court correctly identified that the law in this circuit and every other, as far as I'm aware, is that you can't have either falsity or knowing falsity alleged in a False Claims Act case unless there is some objectively clear standard. If reasonable people could disagree, it's not false or knowingly false. And that's all that this is about. Well, let me pursue that a little bit. Because even if a specific doctor who is wiser than other physicians, a surgeon, thinks that this is a good surgery, I can perform it with very low risk, and I'll save, I'll prevent a lot of strokes, can that still be not compensable under Medicare because it's not generally accepted? If it was not generally accepted, if there was evidence that it was not generally accepted in the medical community and you just had one outlier doctor, then no, that would not be okay. So it's not enough for the doctor, it's not enough that someone has a sincere, maybe even an informed opinion that this is the good thing to do. Medicare and these other systems will reimburse only if it's generally accepted. If it's accepted in the community, Your Honor, the guidance says accepted medical practice in the community. Why is that not an objective test about whether something is accepted in the community? Well, if you apply that as an objective test, then the conclusion that you inevitably reach in this case, which the district court reached, is that there simply is nothing that could lead you to conclude objectively that that standard isn't satisfied here. The district court looked closely at everything that they attached to the complaint and concluded that it is far from clear that what Dr. Sorensen did was even inconsistent with these AHA, ASA guidelines. These guidelines never say that we recommend against the performance of these procedures in the circumstance where the patient hasn't had two strokes. They do not say that. So they don't say you can't do it, but do they say you should or it's proper to? They are not addressed to that question, but you can see it's hiding in the entire backdrop of what's happening here. Those studies that they're citing are evaluating data that was compiled from all over the country that exists exactly because doctors are taking widely different approaches to treating these patients. The data that they're analyzing wouldn't exist if there was only one approach. So maybe my initial question was based on, I'm sure it was based on ignorance to some extent, where surgeons debate whether this is a good thing to do even after a stroke and nobody's really thinking about doing it before strokes except perhaps Dr. Sorensen. Then wouldn't they have written these guidelines the same way and doesn't the absence of something suggesting that there are doctors who agree with Sorensen, there's a substantial group of doctors that agree that this should be done essentially prophylactically? The complaint itself alleges that even among the cardiology staff or doctors at these two hospitals that there were at least two other doctors who agreed with Dr. Sorensen's approach, even in just this little universe. And the AHA, ASA guidelines. But the, I think there are opinions saying that's not enough to have a few doctors doing it. To be generally accepted, it's got to be a much broader database. Is that correct? Right, Your Honor. But in this posture, it is not our burden to prove that this is generally accepted. It is their burden to plead facts showing that it's not. And they have. But I thought you were saying, I mean, we can see how much they've alleged, but I thought you were saying essentially that these articles refute the possibility of this not being generally accepted. I do think that the articles fairly read and read in conjunction with the separate guidance for pre-stroke patients demonstrate that there is a robust medical debate and that the range of accepted medical practice on this issue embraces a wide variety of treatment. Nothing is more common. And the guidance on pre-stroke practice, on pre-stroke patients, is we don't offer any opinion. Is that what the guidance says about this procedure on pre-stroke patients? It says it is well understood that PFOs are a potential source of strokes, including in young people, and it leaves the question of appropriate treatment up to individual doctors. And Your Honor, I think it's incredibly important to recognize that it is very, very common for the range of accepted medical treatment for which you can bill Medicare to be very broad. Think about back surgery, prostate cancer. There are a lot of things about which the medical community is not wholly in agreement. That does not mean that every bill submitted to Medicare for prostate cancer treatment or for back surgery is a fraud. And that is the relator's position in this case. But it doesn't mean that every procedure that a doctor thinks is good is generally accepted. That's true. It is their burden to allege that this is not generally accepted and they just haven't. I'm going to defer the remainder of my time. Thank you, Your Honor. Matthew Knowles for the Intermountain Defendants. May it please the Court. The three defendants have, Intermountain, St. Mark's, and Dr. Sorensen, have raised a number of independent arguments for affirming the decision below and ending this case. I'd like to start by briefly reviewing how these arguments fit together before I turn to their substance. If the Court adopts the theories that any of the defendants have raised as to why the the Court need go no further. And that's true whether the Court agrees with the district court's ruling that expressions of opinion, scientific judgments can't be false under the False Claims Act, or at the very least that Dr. Sorensen's approach comports with a reasonable understanding, a reasonable interpretation of the law, and he therefore can't be a knowing or a reckless violator. There can't be false claims liability. Affirming on those bases end the case as to all the defendants. But if the Court were to reverse as to Dr. Sorensen, there remain important grounds to affirm the decision dismissing the hospital defendants, Intermountain and St. Mark's. Only if the Court were to reverse on all these issues would it need to reach the constitutional argument we raised in our brief. I'd like to begin, though, with the claim against Dr. Sorensen and what is pled in the complaint. The central failure in the complaint is the failure to allege an objectively false claim. The complaint pleads that PFOs caused strokes, that Dr. Sorensen believed it was medically necessary to close PFOs to prevent strokes in high-risk patients, that Dr. Sorensen would risk stratify his patients to decide who needed the closure, and that Dr. Sorensen believed it was unethical to wait for high-risk patients to have a stroke before doing this relatively minor procedure to prevent that stroke from happening. Let me make sure I understand. You say the complaint alleges that he believed this was generally accepted practice? The complaint alleges that Dr. Sorensen believed it was necessary, medically necessary, to close PFOs in high-risk patients. It doesn't address what Dr. Sorensen's belief or knowledge was as to generally accepted practices, nor is that the test, at least under the framework the district court adopted, which is this is a question. That's debatable, whether the district court's framework was correct. If there is an objective standard here of what's medically accepted, it might be very broad and it might include what Dr. Sorensen did, but if that's an objective standard, then it is something that he may have violated and filed a false claim, even if he thought this was a good type of surgery to do. Am I correct about that? You're correct that there is no dispute that where there is an objective standard, a objective standard could be submitting a false claim. But I would submit that the inquiry isn't just whether the district court was correct, but whether the district court's interpretation was a reasonable one, because to the extent Dr. Sorensen's actions comport with a reasonable understanding of the law, he can't be a knowing and reckless violator. That's the lesson of the Supreme Court's decision in SAFCO, where it says that where a statutory text allows for more than one interpretation, as do the relevant court guidelines, someone who follows or acts consistently with one of those reasonable interpretations can't be a knowing and reckless violator. And that's the standard for liability under the False Claims Act. So as long as cases like the Morton decision and similar decisions in other circuits are out there, it's hard to say that this understanding of the law, even if it ends up not being the law forever in this circuit, is an unreasonable one. Dr. Sorensen's actions comported with a reasonable understanding of the law that medical necessity calls for him to make a judgment as a doctor as to what's medically necessary in an environment where the government hasn't laid down a rule, said you can't do this if there aren't two strokes in a national coverage determination and a local coverage determination or any of those kinds of decisions that would establish a solid rule, an objective standard that would bound the medical necessity of physicians. And to be clear, we're not suggesting there has to be some official decision that this is not medically necessary for there for him to violate it. If it's if there isn't any announcement, maybe he's the only person doing it. Well, so, yeah, the complaint pleads to the contrary. The complaint pleads that other physicians at these hospitals agreed with and accepted Dr. Sorensen's interpretation of the medical necessity and they followed it. It pleads that very clearly that the relator disagrees. He thinks his opinion is true and Dr. Sorensen's is false. He asks for a jury trial. So a jury can so he can try and prove to if there were three surgeons who agreed with him at those hospitals that establishes that it's medically necessary, that it's generally accepted. Is that the test or is it a broader test? What it establishes is that in where the discretion is, is not bounded by a rule of law. So Dr. Sorensen's report isn't violating the False Claims Act. He's not violating the False Claims Act, even if the government, through its Medicare contractors, disagree and reject that claim. You're using the term believes it's medically necessary. A doctor can think it's the right thing to do and it wouldn't be bad. It wouldn't be malpractice to do it. But that doesn't mean Medicare has to reimburse. So when you say medically necessary, it seems to me you're using it two different ways here. And I want to make sure you're distinguishing between what the doctor thinks is good treatment and what is generally accepted in the medical community. It doesn't mean that the government has to reimburse it. The government can decide after the claim submitted that it disagrees. It thinks the treatment is not medically necessary. It can reject the claim. A jury in a malpractice case could decide the standard of care is different. But none of those things mean the doctor's opinion was false, let alone knowingly false, and that he violated his opinion of what? That he thought this was a good thing to do or that he thought this was generally accepted. Well, the question is whether it's medically necessary to form the doctor science. Do you disagree with the definition that opposing counsel gave for medically necessary, which is one supported by scientific studies or generally accepted in the community? The CMS manual says that is one factor as the government conceded a few years ago that the standard of care is not medically necessary to form the doctor's  The standard of care is not medically necessary to form the doctor's opinion. It's not a force of law and merely violating, in the government's own words, violating that standard wouldn't give rise alone to a False Claims Act claim. She also relied on adjudications. Do you do? There are no adjudications that state what the standard is. Do you dispute that? Do you dispute that that's the standard? There I dispute that there are any adjudications in any state about not. I'm sorry. Not about this particular procedure, but about how you determine whether something is medically necessary. Do you dispute their contention that it's not medically necessary unless as established in adjudications that say what the standard is, the general standard of how you determine whether something is medically necessary. We dispute that there has been such an adjudication that a physician cannot submit a claim. There hasn't been an adjudication for this procedure. Or an adjudication to say that that is a condition precedent to submitting a claim. I'm as I'm short on time, I'd like to briefly address the claim. That seems to be absolutely essential to the case. I'm sorry to pursue it. Another question. But you're saying that that the standard that's in the manual has not been authoritatively adopted in adjudications as being a requirement for medical necessity. It's been right. It is to the extent it's been adopted. It's been in challenges to a decision rejecting a claim that's already been submitted. Not in a statement by the government that this is the standard for submitting claims. And if you violate it, your claim is false. As to the as the claim against Intermountain, I want to be very clear that we absolutely dispute and disaggregate the idea that Intermountain certified the medical necessity of Sorensen's procedure. That's in pages 39 and 40 of our brief. Intermountain certified that what it did was medically necessary. That if a patient's under anesthesia, you need a specialized nurse there to. Well, but as opposing counsel said, I mean, you don't have those people there and those facilities used unless Dr. Sorensen is performing that operation. I don't know how you can separate the two. May I respond? Your Honor, you can't separate the two in the sense that the procedure happened because Dr. Sorensen ordered it and then billed for it and certified it was medically necessary. But as to the question of whether Intermountain Hospital knowingly submitted a false claim, Intermountain's claim is a for what it factually did and be that what it did, the It provided were medically necessary. Thank you, counsel. Thank you. We had some rebuttal time. I'd like to just clean up a few small things before shifting to the big picture here. The first is opposing counsel alluded to the guidance for primary strokes. If you were to read this guidance, you would be decidedly underwhelmed. I think all it says is it lumps PFOs in with other cardiac conditions as things that may contribute to stroke. The specific language he was giving you about how individual doctors should make their own decisions is nowhere in the recommendations. In fact, there is no recommendation at all, given after it talks about other cardiac conditions, it says recommending on that would be beyond the scope of this guidance. What we have left is what I said before. There is a little bit of a debate in the medical community about once you've had a stroke, can you have these procedures? There is no debate about whether you should do it before you have a stroke, because that idea is widely regarded by most people as wacky. It is not an idea that has been taken seriously, and they have not been able to muster any evidence that it is. And this is this is an important point about the big picture here as well, because what they say to you over and again is that the authorities do not conclusively reject this and ambiguity in the authorities is not tantamount to rejection. Even if you accept that proposition as true, we win decidedly because in order to seek federal funds, in order to make a claim on the public fisc, it is their burden to establish necessity. Our job is not to show that this procedure has been generally rejected by the medical community. We think it has been, but we don't have to show that. What we have to show is that it has not been generally accepted. That is, we have pointing to the absence of evidence is good enough on our side. And that is exactly what our complaint does. Another small thing to clean up about whether the local coverage determination standards also apply to individual determinations. This is discussed in detail on page three of our reply brief. There's a case from the Fourth Circuit called Almy versus Sebelius, which gets into this. But basically, the way that this works is whenever CMS makes whenever CMS contractors make either a local coverage determination or an individualized determination under sections 13.3, 13.5 and 13.7 of the manual, they apply the exact same standards. The standards are not different. They say that the complaint is silent about migraines. I'd refer you to paragraph 94 of the complaint, which specifically says that this is not efficacious for migraines and points out that the only randomized clinical trial on this found no efficacy. So there are specific allegations about migraines and specific allegations that Sorenson used this procedure to treat migraines. Now, the last thing that I want to talk about is sort of the big picture here, and I want to reemphasize this is a case at the pleading stage. So much of what they are talking about are factual questions. Did we know? Did we have a reasonable belief? All of that is only we can only really hash that out after there has been discovery into things like their scienter. At the pleading stage, our obligation is merely to plausibly allege that these services were unnecessary and that they knew or should have known that. The complaint makes those allegations quite clearly and repeatedly. And the only real response that they've come up with so far is, well, there is nothing clearly prohibiting this. They have not been able to cite a single case guidance document from CMS or other authority in the context of a medical necessity determination other than the opinion below that makes that holding. There are plenty of cases saying you need objective falsity. But for the reasons, Judge Hartz, that you explained, this is a pretty objective standard. Oh, and one thing I'll say about that, just to wrap up so you know, page three, we quote in detail the adjudications that they claim do not exist, which say this is how you adjudicate this precise question. It is an objective standard. It has been met in this case. And so the judgment below should be reversed. Thank you, counsel. I appreciate the arguments. Those were quite helpful. Counsel are excused. Give you a few minutes to do that.